### TENNESSEE IMPORTS, INC.

v.

### Pier Paulo FILIPPI and Prix Italia S.R.L.

No. 3–89–0717.

United States District Court,
M.D. Tennessee,
Nashville Division.

Aug. 14, 1990.

R. Jan Jennings, Branstetter, Kilgore, Stranch & Jennings, Nashville, Tenn., for plaintiff.

Samuel D. Lipshie, Charlotte U. Fleming, Boult Cummings Conners & Berry, Nashville, Tenn., for defendants.

## MEMORANDUM

JOHN T. NIXON, District Judge.

Pending before the Court is the defendants' motion to dismiss the above-styled action for improper venue or, in the alternative, for lack of subject matter jurisdiction. Also pending before the Court is the plaintiff's motion for leave to amend its complaint, adding Prix U.S.A. Corporation as a defendant.

### I. *The Defendants' Motion To Dismiss*
### FACTS

Plaintiff, Tennessee Imports, Inc. ("Tennessee Imports"), brought this action for breach of contract and tortious interference with contract pursuant to diversity jurisdiction, 28 U.S.C. § 1332. Tennessee

Imports is a Tennessee corporation with its principal place of business in Davidson County, Tennessee. Defendant Prix Italia, S.R.L. ("Prix") is an Italian corporation with its principal place of business in Venice, Italy. Defendant Pier Paulo Filippi ("Mr. Filippi") is Prix's Export Manager and a citizen of Venice, Italy.

In 1985, Tennessee Imports and Prix entered into a one-year contract whereby Prix granted Tennessee Imports the exclusive sales rights in the United States, Canada, and Mexico for certain sequential pricing and labelling machines manufactured by Prix in Italy. In addition to terms for the original one-year period, the contract provided terms for a two-year extension period to become effective unless the parties made "explicit declarations of dissatisfactions." The contract also provided that at the end of the two-year extension the contract would "be automatically renewed year by year, if it is not cancelled by one of the parties giving a three months' notice." Tennessee Imports states that Prix gave the required termination notice on August 21, 1989 and alleges that the contract remained in effect until August 1, 1990.

In its complaint, Tennessee Imports alleges that in May of 1989, Mr. Filippi traveled to New York, New York and Miami, Florida to meet with certain "individuals to discuss import and distribution rights to several machines and products of Prix, including the sequential machines that are the subject of [Prix's] agreements with Tennessee Imports." Tennessee Imports further alleges that at these meetings, Mr. Filippi "made false, misleading, and intentionally incorrect statements by advising individuals at the meeting that Prix had no relationship with Tennessee Imports ... [and] that Prix would not in the future sell any of its products to Tennessee Imports." Tennessee Imports alleges that Mr. Filippi assured these individuals "that they may purchase, import, and resell the sequential machines" that are the subject of Prix's exclusive contract with Tennessee Imports.

Tennessee Imports acknowledges that Mr. Filippi's statements and actions may or may not have been made "with the express knowledge and authorization of Prix" and, if made without such knowledge and authorization, may or may not have been "thereafter adopted as the statements and action of Prix." Nevertheless, Tennessee Imports alleges that these representations and other actions of Mr. Filippi resulted in the destruction of "the valuable dealer network, advertising, and other exclusive trade developed by Tennessee Imports." Tennessee Imports also alleges that Mr. Filippi's statements and actions "were negligent and grossly negligent and have interfered with the agreement between Tennessee Imports and Prix [thereby] directly and permanently causing Tennessee Imports damages in the amount of ... $200,000." Tennessee Imports maintains that these statements and actions "induced and procured a breach of the contract between Prix and Tennessee Imports" in violation of Tenn.Code Ann. § 47–50–109. Finally, Tennessee Imports alleges that Mr. Filippi has informed Tennessee Imports that Prix will not honor recent orders for sequential machines and parts. Tennessee Imports maintains that, should this occur, Tennessee Imports will suffer loss of business and trade and irreparable harm and damage. Tennessee Imports seeks temporary and permanent injunctive relief and, pursuant to Tenn.Code Ann. § 47–50–109, treble damages totaling $600,000.

In response to the plaintiff's complaint, the defendants moved to dismiss for lack of proper venue or, alternatively, for lack of subject matter jurisdiction. In support of their motion, the defendants point to Article 8 of the contract between Prix and Tennessee Imports which provides:

> Should any dispute arise between the contractual parties or in connection with the relations stipulated by this contract and no settlement can be achieved, then both parties agree to the competence of [the] Arbitration Court of [the] Chamber of Commerce in Venice (Italy).

The defendants claim that this forum selection clause renders venue in this Court improper and thus that this action should be dismissed.

Tennessee Imports filed a memorandum in opposition to Defendants' Motion to Dismiss ("Plaintiff's Memo") making the following arguments:

1) That Article 8 of the contract is not a forum selection clause because the Arbitration Court of the Chamber of Commerce in Venice is not a "judicial institution" listed in the *Martindale–Hubble Italy Law Digest* and therefore is a "non-judicial and possibly non-existent forum";

2) That enforcement of Article 8 would result in substantial inconvenience to Tennessee Imports and would deny Tennessee Imports effective relief;

3) That, because the sequential machines manufactured by Prix are a unique product and unavailable from other free-world sources, the bargaining position of the two parties was unequal. Thus, Tennessee Imports argues, Prix used its economic power to obtain Tennessee Imports' agreement to Article 8 without negotiation and, as such, Article 8 is adhesive and unconscionable;

4) That Mr. Filippi's conduct in inducing and procuring Prix's breach of contract was tortious and, therefore, that its claim against Mr. Filippi is not within the scope of the forum selection clause found in Article 8 of the contract; and

5) That the public policy of the State of Tennessee and the State's interest in protecting its citizens and in providing them with an equitable forum warrant the Court's retention of this action.

Darrell Johnson, CEO of Tennessee Imports, attests that, after inquiry by Tennessee Imports regarding the "availability of [Prix's] machines for import and distribution into the State of Tennessee," Prix drew up the contract at issue and forwarded it to Tennessee Imports; that "there was no bargaining at all concerning the forum selection clause;" that the sequential machines manufactured by Prix were unavailable from any other source in the free world; and that upon receiving the contract from Prix, Mr. Johnson executed it. Mr. Johnson also attests that "all of the evidence and witnesses except [Mr.] Filippi ... are found in the United States."

The defendants have responded to the plaintiff's arguments as follows:

1) That the Arbitration Court referred to in Article 8 is the Arbitration Court of the International Chamber of Commerce (the "ICC Arbitration Court"), a well-recognized and competent arbitral body which may conduct proceedings at the Venice location specified in the contract. The defendants maintain that the ICC Arbitration Court is "specifically tailored to handle international disputes" such as that between Prix and Tennessee Imports and will afford Tennessee Imports an effective forum in which to seek relief;

2) That Tennessee Imports has failed to show that arbitration in Italy would cause Tennessee Imports sufficient inconvenience to justify a refusal by this Court to enforce Article 8 of the contract;

3) That the contract between Prix and Tennessee Imports was the result of "arms length negotiations by experienced and sophisticated business entities;"

4) That Tennessee Imports' claim of tortious interference falls within the scope of Article 8 and thus should be resolved through arbitration; and

5) That, because of the expansion of American trade and commerce in world markets, public policy now supports upholding forum selection clauses such as Article 8 of the contract.

In support, Prix has submitted the affidavit of Deborah Inix–Ross, the Manager of Legal Affairs for the United States Council for International Business (the United States Affiliate of the ICC) attesting to the expertise of the ICC Arbitration Court in settling international commercial disputes and to the availability of ICC arbitration in Venice. The defendants have also submitted the sworn declaration of Mr. Filippi stating that although Tennessee Imports did not bargain about Article 8, neither did

it raise any objections to its inclusion in the contract. Mr. Filippi maintains that "Tennessee Imports orally agreed to Section 8, ... advising [him] that the forum selection clause ... *was fine*," Mr. Filippi also maintains that Tennessee Imports "consistently failed to comply with the terms" of the parties' contract and as a result Prix informed Mr. Johnson in July of 1989 "that Tennessee Imports would no longer be [Prix's] distributor...." Mr. Filippi further maintains that on August 22, 1989, Prix advised Tennessee Imports that, as a result of Tennessee Imports' breaches of the parties' agreement, Prix had terminated the contract.

Mr. Johnson attests by affidavit that "Pier Paulo Filippi was never present during any contract negotiations, and that "[a]ll contract negotiations were handled by [Filippi's] father, Lamberto Filippi." Mr. Johnson maintains that "Article 8 ... was never discussed during those negotiations." Mr. Johnson also denies any failure on the part of Tennessee Imports to comply with the terms of the contract.

## DISCUSSION

### A. *Introduction*

■ In making their arguments to the Court regarding the validity and enforceability of Article 8 of the contract, both the plaintiff and the defendants have relied, to some extent, upon Tennessee law. Nevertheless, because the forum selection clause at issue is also an arbitration clause found in the contract involving international commerce, its validity, interpretation, and enforcement are governed by the Federal Arbitration Act (the "Arbitration Act" or the "Act"), 9 U.S.C. § 1 *et seq.* Although neither party has specifically addressed this statute, to the extent that the facts alleged and the arguments made in the pleadings, affidavits, and memoranda have bearing on the application of the Act to this action, the Court has considered them in making its decision.

■ The defendants have moved to dismiss for lack of proper venue or, in the alternative, for lack of subject matter jurisdiction. Thus, although the Court has considered matters outside the pleadings (i.e. the affidavits and memoranda submitted by parties), it need not treat the defendants' motion as a motion for summary judgment as is the case when the Court considers outside matters in resolving a motion to dismiss under Federal Rule 12(b)(6). *See e.g., Rogers v. Stratton Indus., Inc.,* 798 F.2d 913, 915 (6th Cir.1986). When, as here, a party challenges venue or jurisdiction, the court may consider outside matters and "is empowered to resolve factual disputes." *Id.; see also Moir v. Greater Cleveland Regional Transit Authority,* 895 F.2d 266, 269 (6th Cir.1990). "No presumption of truthfulness attaches to the plaintiff's allegations." *Mortensen v. First Federal Savings and Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977). *See generally,* 5 C. Wright & A Miller, Federal Practice & Procedure, Civil 2d § 1364 (1990).

### B. *The Federal Arbitration Act*

Congress enacted the Arbitration Act in 1924 "to ensure judicial enforcement of privately made agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 219, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1985). The legislative history of the Act indicates that Congress intended the Act "to place an arbitration agreement 'upon the same footing as other contracts where it belongs,' and to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate." *Id.* at 220, 105 S.Ct. at 1242 (quoting H.R.Rep. No. 96, 68th Cong., 2d Sess., 1 (1924)). Section 2, the Act's "centerpiece provision," *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 625, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985), provides:

A written provision in any maritime contract or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, ... shall be *valid, irrev-*

*ocable,* and *enforceable* save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (emphasis added).

The Act sets up "a presumption in favor of arbitration," *Marchetto v. DeKalb Genetics Corp.,* 711 F.Supp. 936, 938 (N.D.Ill. 1989) (citing *Mitsubishi Motors,* 473 U.S. at 625, 105 S.Ct. at 3353; *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 941–42, 74 L.Ed.2d 765 (1983)), and requires that courts "rigorously enforce agreements to arbitrate." *Byrd,* 470 U.S. at 221, 105 S.Ct. at 1242.

In the field of international commerce, this presumption in favor of arbitration was strengthened by the 1970 addition of Chapter Two, 9 U.S.C. §§ 201–208, to the Act. Chapter Two implemented the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"), [1970] 3 U.S.T. 2571, T.I.A.S. No. 6997, reprinted at 9 U.S.C.A. § 201 note (1990 Supp.). Both the United States [1] and Italy [2] are parties to the Convention.

Section 202 of the Arbitration Act provides in part that:

> [a]n arbitration agreement ... arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 [of Chapter One] of this title, falls under the Convention.

9 U.S.C. § 202.

If, however, the agreement is "entirely between citizens of the United States," it does not fall under the Convention unless the relationship between the parties to the agreement "has some ... reasonable relation with one or more foreign states." *Id.*

■ The language of the Convention [3] contemplates a very limited inquiry by the courts in determining the enforceability of arbitration clauses found in international commercial agreements. *Sedco v. Petroleos Mexicanos Mexican National Oil Co.,* 767 F.2d 1140, 1144 (5th Cir.1985); *accord Ledee v. Ceramiche Ragno,* 684 F.2d 184, 186 (1st Cir.1982). In making this determination, the Court must first address four questions:

1) Is there an agreement in writing to arbitrate the subject of the dispute? Convention, Articles II(1), II(2).

2) Does the agreement provide for arbitration in the territory of a signatory country? Convention, Articles I(1), I(3); 9 U.S.C. § 206; Declaration of the United States upon accession, reprinted [at 9 U.S.C.A. § 201, Note 43 (1990 Supp.)].

3) Does the agreement arise out of a legal relationship, whether contractual or not which is considered as commercial? Convention, Article I(3); 9 U.S.C. § 202.

---

**1.** The United States ratified the Convention on September 30, 1970 with certain reservations as allowed by Article I(3) of the Convention. These reservations include the following:

■ The United States of America will apply the Convention, on the basis of reciprocity, to the recognition and enforcement of only those awards made in the territory of another Contracting State.

■ The United States will apply the Convention only to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under the national law of the United States.

**2.** Italy ratified the Convention on January 31, 1969 without reservations.

**3.** Article II(1) of the Convention provides:

Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of arbitration.

Article II(2) defines "an agreement in writing" as including "an arbitral clause in a contract...." Article II(3) of the Convention provides:

The Court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

4) Is a party to the contract not an American citizen, or does the commercial relationship have some reasonable relation with one or more foreign states? 9 U.S.C. § 202.

*Ledee,* 684 F.2d at 186–87.

The first of these four questions addresses both the form and scope of the arbitration agreement. First, the agreement must be "an agreement in writing," a requirement satisfied by the inclusion of the agreement in a written contract. Convention, Article II(2). Second, the agreement must be "an agreement ... to arbitrate the subject of the dispute." Here, the court must first determine whether the clause is broad or narrow. *Sedco,* 767 F.2d at 1145; *Prudential Lines, Inc. v. Exxon Corp.,* 704 F.2d 59, 64 (2d Cir.1983). If the clause is broad, and arguably encompasses the parties' disputes, the court should "permit the arbitrator to decide whether the dispute falls within the clause.... In contrast, if the clause is 'narrow,' arbitration should not be compelled unless the court determines that the dispute falls within the clause." *Prudential Lines,* 704 F.2d at 64. And, "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.... [A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration...." *Moses H. Cone Memorial Hospital,* 460 U.S. at 24–25, 103 S.Ct. at 941; *accord Mitsubishi Motors,* 473 U.S. at 626, 105 S.Ct. at 3353–54. The three remaining questions address the citizenship of the contracting parties and the nature of their relationship.

If the court answers these four questions affirmatively, it must enforce the arbitral agreement "unless it finds the agreement 'null and void,' inoperative or incapable of being performed. Convention, Article

II(3)." *Ledee,* 684 F.2d at 187. Any interpretation of the "null and void" clause must recognize the presumption in favor of arbitration and "must also foster the adoption of standards which can be uniformly applied on an international scale." *I.T.A.D. Associates, In. v. Podar Bros.,* 636 F.2d 75, 77 (4th Cir.1981). "[A]n expansive interpretation of the ['null and void'] clause would be antithetical to the goals of the Convention," *Ledee,* 684 F.2d at 187, and the court should not allow parochial interests to interfere with its enforcement of arbitration clauses. *See Mitsubishi Motors,* 473 U.S. at 629–31, 105 S.Ct. at 3355–56; *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 519–520, 94 S.Ct. 2449, 2454, 41 L.Ed.2d 270 (1974). Instead, the court should limit application of the "null and void" clause to cases in which the arbitration agreement itself is "subject to an internationally recognized defense such as duress, mistake, fraud or waiver, or ... when [the agreement] contravenes fundamental policies of the forum state." *Rhone Mediterranee Compagnia Francese di Assicurazioni e Riassicurazoni v. Lauro,* 712 F.2d 50, 53 (3d Cir.1983) (citations omitted); *see also Ledee,* 684 F.2d at 184; *Podar Bros.,* 636 F.2d at 77.

If, after considering the above criteria, the court finds that an arbitration agreement is enforceable under the Convention, the court must "at the request of one of the parties, refer the parties to arbitration." Convention, Article II(3).[4] As the Third Circuit has observed, "[t]here is nothing discretionary about [A]rticle II(3) of the Convention." *McCreary Tire & Rubber Co. v. CEAT S.P.A.,* 501 F.2d 1032, 1037 (3d Cir.1974). When a claim falls within the scope of an arbitration clause enforceable under the Convention, the court has no choice but to enforce it by

**4.** Although in the instant case the defendants have not expressly requested the Court to refer this action to arbitration, they have pointed to Article 8 of the contract as a forum selection clause in support of their motion to dismiss. In *Scherk,* the Supreme Court noted that "[a]n agreement to arbitrate before a specified tribunal is, in effect, a specialized forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the

dispute." 417 U.S. at 519, 94 S.Ct. at 2457. In light of the defendants' reference to Article 8, the Court sees no reason why it should not also treat their motion as a request to refer the parties to arbitration. *Cf. Instituto Cubano de Establizacion del Azucar v. The S/S Rodestar,* 143 F.Supp. 599, 600 (S.D.N.Y.1956) (raising arbitration clause as a defense in answer is treated as a application for a stay pending arbitration pursuant to 9 U.S.C. § 3).

referring the parties to arbitration. The proper method of referral, however, has been the cause of some controversy among the courts.

Section 206 of Chapter II of the Arbitration Act provides that the Court "may direct arbitration be held in accordance with the [parties'] agreement at any place therein provided for, whether within or without the United States." 9 U.S.C. § 206. Much like Section 4 of Chapter I, this provision empowers the court to compel arbitration, although it is broader in its reach because it allows a court acting under the Convention to compel arbitration outside its jurisdiction as well as within it. Unlike Section 3 of Chapter One, however, neither the Convention nor Chapter Two of the Arbitration Act provides for a stay of an action pending arbitration. This omission has raised some question as to whether the court, when acting under the Convention may retain jurisdiction over an action once the court finds it falls within an enforceable arbitration clause. Apparently, there is a split among the few courts that have specifically addressed this question.

In holding improper a pre-judgment foreign attachment in an action falling under the Convention, the *McCreary* court made the following comment:

> Unlike § 3 of the [Arbitration] Act, Article II(3) of the Convention, the court of a contracting state shall "refer the parties to arbitration" rather than "stay the trial of the action." The Convention forbids the courts of a contracting state from entertaining a suit which violates an agreement to arbitrate.

501 F.2d at 1038.

Some courts have seized upon this language as support for the proposition that the "finality of the referral procedure, and the absence of any provision [in the Convention] for the retention of jurisdiction after referral by the court, indicates that dismissal of the complaint for lack of subject matter jurisdiction is the appropriate remedy under the Convention." *Siderius,*

*Inc. v. Compania de Acero del Pacifico,* 453 F.Supp. 22 (S.D.N.Y.1978); *accord McDonnell Douglas Corp. v. Kingdom of Denmark,* 607 F.Supp. 1016 (D.C.Mo.1985); *Ledee v. Ceramiche Ragno,* 528 F.Supp. 243, 245–46 (D.P.R.1981), *aff'd,* 684 F.2d 184 (1st Cir.1982). *See also J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.,* 863 F.2d 315, 317, 322 (4th Cir.1988) (affirming dismissal of arbitrable issues for lack of subject matter jurisdiction); *Marchetto v. DeKalb Genetics Corp.,* 711 F.Supp. 936, 941 (N.D.Ill.1989) (citing *Ledee, McCreary,* and *McDonnell Douglas* as authority for dismissal without prejudice). This rule, however, should not interfere with the court's authority to stay related or collateral litigation involving non-arbitrating parties or non-arbitrable disputes. Such a stay would be within the discretion of the court in controlling its docket. *See Moses H. Cone Memorial Hospital,* 460 U.S. at 19–21 and n. 23, 103 S.Ct. at 939 and n. 23. *See generally Landis v. North American Co.,* 299 U.S. 248, 254–55, 57 S.Ct. 163, 165–66, 81 L.Ed. 153 (1936).

Other courts, however, disagree that referral to arbitration mandates an outright dismissal of arbitrable issues. In *Rhone Mediterranee,* 712 F.2d 50, the Third Circuit affirmed the district court's holding that a stay pending arbitration was the proper method of referral under the Convention. The district court disagreed with the defendants' reading of *McCreary* which paralleled that in *Siderius.* The district court observed that, although the *McCreary* court did "refer the parties to arbitration," that court "did not order the district court to dismiss the action."[5] The Court went on to say:

> Our interpretation of *McCreary* is that if a controversy must be referred to arbitration under the Convention, no other judicial action should be taken in the interim. Arbitration does not merely stay the trial, it stays all proceedings.... Further, any pre-trial judicial action that was taken prior to arbitration, which is in

5. The *McCreary* court, in fact, reversed the district court's denial of a stay pending arbitration, holding "it was an error to deny the motion to

stay in disregard of the [C]onvention." 501 F.2d at 1037.

conflict with the terms of the arbitration must be removed from a court's docket. *Rhone Mediterranee Compagnia Francese di Assicurazioni e Riassicurazoni v. Lauro,* 555 F.Supp. 481, 486 (D.V.I.1982), *aff'd,* 712 F.2d 50 (1983).

*See also Genesco, Inc. v. T. Kakiuchi & Co., Ltd.,* 815 F.2d 840 (2d Cir.1987) (both arbitrable and non-arbitrable issues may be stayed pending arbitration); *Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk GmbH,* 585 F.2d 39 (3d Cir.1978) (reversing district court's refusal to stay action pending arbitration).

Chapter Two of the Arbitration Act arguably provides some authority for the latter position. Section 208 provides that "Chapter 1 applies to actions and proceedings brought under this chapter to the extent that chapter is not in conflict with this chapter or the Convention as ratified by the United States." 9 U.S.C. § 208. Thus, in the absence of any express prohibition of stays, this section may impliedly incorporate into Chapter Two the § 3 provision for stays pending arbitration. Some commentators have also suggested that stays are not inconsistent with the Convention. *See, e.g.* Quigley, Accession by the United States to the United nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 70 Yale L.J. 1037 (1961) (proposing that referral to arbitration under the Convention is akin to a stay pending arbitration).

Apparently, the Sixth Circuit has not had occasion to rule on this aspect of the Arbitration Act, and this Court finds some merit in both positions. Although the Court agrees with the *McCreary* court that referral to arbitration is mandatory under the Convention and the Act, the Court does not see that the language of the Convention and the Act clearly mandates referral to arbitration exclusively in the form of either a dismissal or a stay of arbitrable issues. Nor does the Court find any language which suggests that the Convention and the Act cannot accommodate both methods of referral. The Restatement (Third) of the Foreign Relations Law of the United States (1986) [the "Restatement"] reaches the same conclusion. Section 487 of the Restatement provides in part:

(2) a court in a state party to the Convention must, at the request of any party *stay or dismiss* the action pending arbitration if an agreement to arbitrate falling under the Convention is in effect and covers the controversy on which the action is based. (Emphasis added).

The Restatement also recognizes the court's authority to compel arbitration when appropriate. *See* Restatement § 487, comment e. The Court finds the approach of the Restatement both sensible and compatible with the goals of the Convention and the Arbitration Act.

■ From the perspective of the parties, the actual effects of a dismissal may well, in some instances, be indistinguishable from those of a stay. In the case of narrow arbitration clauses, the court will determine if issues fall within the scope of an arbitration clause before referring them to arbitration. *Sedco,* 767 F.2d at 1145, *Prudential Lines,* 704 F.2d at 63. Even in the case of broad arbitration clauses (where the arbitrability of issues arguably falling within the scope of the clause will be left to the arbitrators, *id.*) some claims, on their face, may so clearly fall within the scope of a clause that there will be no question as to their arbitrability. In either case, it appears that the grant of a stay serves no function other than that of postponing the inevitable dismissal of such actions until the completion of arbitration. In the absence of compelling reasons for such a postponement, dismissal for lack of subject matter jurisdiction seems an appropriate means of referring parties to arbitration.

Furthermore, upon a finding by the court that an issue must be referred to arbitration, parties seeking recovery should, whenever possible, be left free to choose whether or not to continue pursuit of their claims in the arbitral forum. Here, the availability of dismissal would prevent unpursued claims from languishing unnecessarily and indefinitely on the court's docket. Finally, should parties require subsequent assistance from the court in enforc-

ing or setting aside arbitral awards which clearly contradict federal public policy, the Arbitration Act and the Convention provide recognition and suspension procedure. 9 U.S.C. § 207; Convention Articles III–VI. The Court, however, need not and should not automatically anticipate the need for future judicial involvement. *See Mitsubishi Motors*, 473 U.S. at 637, 105 S.Ct. at 3359 ("There is no reason to assume at the outset of the dispute that international arbitration will not provide an adequate mechanism").

■ Nevertheless, in certain cases, a stay may be a more appropriate solution. Should, for instance, the court deem preliminary injunctive relief necessary to ensure that the arbitration process remains a meaningful one, (see discussion *infra*, Part C(2)) a stay would preserve the court's authority to order such relief without unduly interfering in the arbitration of the underlying claims. Also, when claims arguably fall within a broad arbitration clause but the ultimate determination of such issues is far from certain, a stay of such claims may be justified, at least until their arbitrability has been determined by the designated arbitral body.

Preserving both avenues of referral, alongside the § 206 provisions for compelling arbitration should the need arise, best guarantees that the goals of the Act and the Convention are fulfilled. Dismissal, in appropriate cases, acknowledges the Act's goal of enforcing privately negotiated arbitration agreements and the Convention's concern that signatory countries overcome parochial, protectionist policies and fully recognize the ability of alternative forums to resolve disputes fairly and effectively. Staying actions, in appropriate cases, allows the courts to ensure that arbitration remains a meaningful process.

Following the guidelines set out above, the Court now turns to the enforceability of the Article 8 arbitration clause as to the plaintiff's claims against each of the defendants.

## C. *Tennessee Imports' Claims Against Prix Italia*

### 1. *Claims at Law*

■ The contract between Tennessee Imports and Prix clearly evidences a commercial relationship between the parties: the sale and purchase of goods by corporate entities. This transaction is also an international one. Prix manufactures sequential machines in Italy. Tennessee Imports purchased them for sale in the United States, Canada, and Mexico. Each of the two parties is incorporated and has its principal place of business in a different signatory country; Tennessee Imports in the United States and Prix in Italy. Article 8 of the sales contract contains an express agreement to arbitrate and provides for arbitration in Italy, a signatory to the Convention. Clearly, the arbitration agreement between Tennessee Imports and Prix is the type of agreement contemplated by the Convention. Thus, if the disputes between these parties fall within the scope of their arbitration agreement, this Court must enforce that agreement unless the Court finds that it falls within the meaning of the "null and void" clause of the Convention.

In Article 8, the parties agree to arbitrate *"any dispute aris[ing] between the contractual parties or in connection with the relations stipulated by the contract* [for which] no settlement can be achieved ..."* (emphasis added). The emphasized language gives this clause a very broad scope. Indeed, the Second Circuit has observed that "[i]t is difficult to imagine broader general language than contained in the ... arbitration clause, 'any dispute'...." *Caribbean Steamship Co. v. Sonmez Denizcilik Ve Ticaret*, 598 F.2d 1264, 1266 (2d Cir.1979); *accord Sedco*, 767 F.2d at 1145. When the language of an arbitration clause is broad, the court should "focus on the factual allegations in the complaint rather than the legal causes asserted. If the allegations underlying the claims 'touch matters' covered by the parties' [contract], then those claims must be arbitrated, whatever the legal labels attached to them." *Genesco*, 815 F.2d at 847

(citing *Mitsubishi Motors*, 473 U.S. at 622 n. 9, 624 n. 13, 105 S.Ct. at 3352 n. 9, 3353 n. 13); *accord J.J. Ryan & Sons*, 863 F.2d at 319.

Tennessee Imports has made no claims at law against Prix which do not touch in some way upon the exclusive agreement between the parties. First, Tennessee Imports claims a breach of contract. There can be no doubt that this claim falls within the scope of Article 8. Tennessee Imports' claim of inducing and procuring breach cannot be directed at Prix. "A party cannot tortiously induce a breach of its own contract." *Nashville Marketplace Company v. First Capital Institutional Real Estate, Ltd.*, slip copy, 1990 WL 33373 at 9 (Tenn.App.1990). Although Tennessee Imports has alleged some facts which might give rise to other tort claims (misrepresentation of bad faith, e.g.), Tennessee Imports cannot escape arbitration merely by characterizing these claims as sounding in tort. Courts have consistently held that broad arbitration clauses encompass contract-based tort claims. *See, e.g., J.J. Ryan & Sons*, 863 F.2d 315 (unfair trade practices, tortious interference, conversion, libel, and defamation are all arbitrable issues); *Genesco*, 815 F.2d 840 (fraud, unfair competition, unjust enrichment, and tortious interference). The Court finds no basis for any claims against Prix that fall outside the scope of Article 8 which encompasses virtually any dispute which touches upon the parties' contractual relationship. Thus, all of Tennessee Imports' claims against Prix are arbitrable ones, and only if the Court finds, in accordance with Article II(3) of the Convention, that the arbitration clause is "null and void, inoperative, or incapable of being performed" may it refuse to refer the parties to arbitration.

Here, Tennessee Imports has made several relevant arguments. First, Tennessee Imports argues that Article 8 is not a forum selection clause because the Arbitration Court of the Chamber of Commerce in Venice is not a "judicial institution" listed in the *Martindale-Hubble Italy Law Digest* and therefore is a "non-judicial and possibly non-existent forum." Considering this argument in light of the Arbitration Act, the Court takes this as an argument that the clause is "incapable of being performed."

Tennessee Imports' argument that the Arbitration Court of the Chamber of Commerce in Venice is a non-judicial forum completely ignores the quasi-judicial nature of arbitral bodies. *See generally* 5 Am. Jur.2d *Arbitration and Award* § 84 (1962). The omission of an arbitral body from the *Martindale–Hubble* listing of Italy's judicial institutions provides no support at all for Tennessee Imports' half-hearted contention that the Arbitration Court is a "*possibly* non-existent forum." (emphasis added). There is no reason for a quasi-judicial body to be listed among judicial institutions, and such an omission is neither surprising nor dispositive in any way.

Furthermore, Tennessee Imports has offered no reply to the defendants' assertion that Article 8 refers to the ICC arbitration court. The ICC Arbitration Court is, as the affidavit of Ms. Enix–Ross attests, a well-recognized and highly-regarded arbitral institution specializing in the field of international commercial disputes. *See generally Comment: Enforcing International Commercial Arbitration Agreements— Post Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 36 Am.U.L.Rev. 57, 65 & nn. 37–38 (citing sources and general statistics regarding the ICC Arbitration Court). There is little doubt that the ICC Arbitration Court can offer Tennessee Imports an effective forum. Even absent the defendants' assertion, however, Tennessee Imports has offered this Court no substantive evidence that enforcement of Article 8 would in fact deprive it of a forum in which to seek redress for its grievances.

■ Tennessee Imports' argument that enforcing Article 8 would cause it substantial inconvenience, presumably by forcing it to transport witnesses and to incur the expense and risk of seeking redress in a distant and foreign forum, is equally without merit. As the Second Circuit has observed, the:

inability to produce one's witnesses before an arbitral tribunal is a risk inherent

in an agreement to submit to arbitration. By agreeing to submit disputes to arbitration, a party relinquishes his courtroom rights—including that to subpoena witnesses—in favor of arbitration "with all of its well know advantages and drawbacks." *Parsons & Whittemore Overseas Co., Inc. v. Societe Generale de L'Industrie du Papier*, 508 F.2d 969, 975 (2d Cir.1974) (quoting *Washington–Baltimore Newspaper Guild, Local 35 v. The Washington Post Co.*, 442 F.2d 1234, 1238 (D.D.C.1971). The frequency with which depositions and affidavits are used in international litigation and arbitration further detracts from the Tennessee Imports argument. *See M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 19, 92 S.Ct. 1907, 1918, 32 L.Ed.2d 513 (1972) (noting that "[i]t is not unusual for important issues in international admiralty cases to be dealt with by deposition"). The Court agrees with the defendants that Tennessee Imports has failed to demonstrate that it will be inconvenienced and prejudiced so significantly as to overcome the strong presumption in favor of arbitration mandated by the Arbitration Act and the Convention.

In *Mitsubishi Motors*, the Supreme Court observed that, while honoring this strong presumption in favor of arbitrability, courts must still "remain attuned to *well-supported* claims that the *agreement to arbitrate* resulted from the sort of fraud or overwhelming economic power that would provide grounds for 'the revocation of any contract.'" 473 U.S. at 627, 105 S.Ct. at 3354 (emphasis added). In the case of a broad arbitration clause, the court's inquiry is limited to whether the arbitration clause itself, as opposed to the entire contract, was obtained through such means. *See Pierson v. Dean, Witter, Reynolds, Inc.*, 742 F.2d 334, 338 (7th Cir. 1984) (citing cases).

Mr. Johnson attests that he "would not have executed the contract ... [had he]

known that [the defendants] would take the action which is described in the Complaint." Mr. Johnson maintains that the defendants' failure "to reveal in advance that they would take such action ... was false and misleading." Certainly, not every breach of contract rises to the level of fraud or misrepresentation. Nevertheless, assuming arguendo that prix entered into or renewed its contract with Tennessee Imports intending to breach that contract, such actions would call into question the formation of and obligations arising under the entire contract, not simply the arbitration agreement. Such claims would fall within the broad scope of the parties' arbitration agreement.

Tennessee Imports also makes allegations which specifically attack the validity of Article 8. Tennessee Imports argues that Prix used its superior economic power to obtain Tennessee Imports' assent to Article 8 without negotiation and, as such, Article 8 is adhesive and unconscionable. The Uniform Commercial Code[6] addresses the subject of unconscionability in § 2–302. Comment 1 states that:

> [t]he basic test [of unconscionability] is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract.... The principal is one of the prevention of oppression and unfair surprise and not of disturbance of allocation of risks because of superior bargaining power (citations omitted).

U.C.C. § 2–302, Comment 1 (1989).

Although, by this definition, unconscionability may fall short of outright duress or fraud, the language of comment 1 suggests that unconscionability does encompass a sort of quasi-duress ("oppression") and quasi-fraud ("unfair surprise"). As such, unconscionability is sufficiently related to duress and fraud that a finding that Prix

---

6. In the absence of well-established principles of federal contract law, the Court seeks guidance from the Uniform Commercial Code in evaluating Tennessee Imports' claims of unconsciona-

bility. *See Spring Hope Rockwool, Inc. v. Industrial Clean Air, Inc.*, 504 F.Supp. 1385, 1388 (E.D.N.C.1981).

obtained Tennessee Imports' agreement to Article 8 by an unconscionable means could serve to negate the validity of that agreement.

Tennessee Imports argues that because "the sequential machines are not available through any other source in the free world, ... Tennessee Imports was in no position to bargain" and that it "agreed to [the arbitration clause] in order to become the United States distributor of the unique product." Plaintiff's Memo, 9. Nevertheless, as comment 1 suggests, superior bargaining power on the part of one of the parties is, in and of itself, insufficient to support a claim of unconscionability. *Pierson*, 742 F.2d at 339. Otherwise, virtually every distributor of a "unique product" would be subject to unconscionability claims.

Tennessee Imports has made no allegation that it attempted unsuccessfully to negotiate over the inclusion of Article 8 in the contract or that it voiced any objection to it. Even assuming, as Tennessee Imports maintains, that the inclusion of Article 8 was non-negotiable, the plaintiff's own argument indicates that it considered Article 8 the price of becoming the exclusive distributor of Prix's "unique product." If that price was too dear, Tennessee Imports was free to walk away. Instead, Tennessee Imports choose to execute the contract as submitted by Prix.

Neither has Tennessee Imports made any allegations which might support a claim that it was unfairly surprised by the presence of the arbitration clause in its contract with Prix. Article 8 is not hidden in the small print boilerplate of a standard form contract. It is not the product of a battle of forms. It is not buried among the provisions of a lengthy and complex sales agreement. On its face, the contract appears to be one specifically drawn to define the relationship between these two parties. Article 8 is the final provision of the contract and appears on the same page as the parties signatures. Tennessee Imports appears to have had ample opportunity to examine the contract before executing it.

In short, Tennessee Imports has alleged no facts nor made any arguments which convince this Court that it was the victim of the type of oppression or unfair surprise contemplated by the doctrine of unconscionability. As White and Summers have observed, "the courts have not generally been receptive to pleas of unconscionability by one merchant against another. Presumably, few businessmen ... are victims of the kinds of gross advantagetaking that usually calls forth § 2–302." White & Summers, *Uniform Commercial Code* § 4–2 at 149 (2d ed. 1980). It may well be true that Tennessee Imports had no choice other than to take or leave the contract as presented by Prix, including an unwanted arbitration clause. Nevertheless, Tennessee Imports *choose* to take it, a choice made in anticipation of enjoying the profits of an exclusive distributorship. Having made its choice, Tennessee Imports must now abide by it.

 Finally, Tennessee Imports argues that public policy dictates against enforcement of Article 8. Tennessee Imports argues that innocent parties should not be forced to seek redress in distant, foreign forums. Whether or not Tennessee Imports is in fact an innocent party, this argument demonstrates the type of parochialism which the Arbitration Act and the Convention have sought to overcome. The Act, the Convention, and the case law interpreting them clearly establish a strong federal policy favoring arbitration. "The utility of the Convention in promoting the process of international commercial arbitration depends upon the willingness of national courts to let go of matters they normally would think of as their own." *Mitsubishi Motors*, 473 U.S. at 639, n. 21, 105 S.Ct. at 3360, n. 21. Absent any reason to except Tennessee Imports from this policy, this Court has no choice but to refer Tennessee Imports' claims against Prix to arbitration.

### 2. Claims at Equity

 In addition to requesting monetary damages, Tennessee Imports has also made a prayer for temporary and permanent injunctive relief. Tennessee Imports re-

quests this relief to prevent Prix's failure and refusal to honor its contract and alleges that "due to the exclusive nature of the sequential machines, Tennessee Imports will suffer irreparable harm in the event that the contract is not honored."

Because permanent injunctive relief is granted more appropriately as a final award, *see, e.g., U.S. v. Baltimore & Ohio Railroad Co.,* 225 U.S. 306, 322, 32 S.Ct. 817, 820, 56 L.Ed. 1100 (1912), than in the early stages of an action, its availability is an issue properly left to arbitration. Preliminary injunctive relief, however, is designed to preserve the *status quo* of the parties in an ongoing action and is available when it is necessary "to protect the integrity of the applicable dispute resolution process." *Ortho Pharmaceutical Corp. v. Amgen, Inc.,* 882 F.2d 806, 814 (3d Cir.1989).

■ Whether preliminary injunctive relief is available in actions governed by the Arbitration Act is not a completely settled area of federal law, but the majority of courts now appear to hold that a grant of preliminary injunctive relief is not inconsistent with the Act, "provided the court properly exercises its discretion in issuing the relief." *Ortho Pharmaceutical,* 882 F.2d at 811. *See also Teradyne, Inc. v. Mostek Corp.,* 797 F.2d 43, 47–51 (1st Cir. 1986) (summarizing case law from various circuits and concluding that preliminary injunctive relief is available under the Act). The Sixth Circuit has not yet ruled on this issue, however, and this Court need not reach this issue in its decision today. Upon examinationof the record, the Court concludes that even if preliminary injunctive relief is available under the Act, a grant of such relief would be inappropriate in the instant case.

Although, in most cases, the court will and should conduct a hearing before making a determination on the availability of preliminary injunctive relief, not every prayer for preliminary injunctive relief requires a hearing. Where the "plaintiff's allegations [in support of the preliminary injunction], even if prove, [are] insufficient to warrant issuance of an injunction," the court may deny such relief without hearing testimony. *Schlosser v. Commonwealth Edison Co.,* 250 F.2d 478, 480 (7th Cir.), *cert. denied,* 357 U.S. 906, 78 S.Ct. 1150, 2 L.Ed.2d 1156 (1958). Tennessee Imports' prayer for injunctive relief presents just such a case.

There are four factors courts should balance in determining whether to grant a preliminary injunction. First, the plaintiff must demonstrate a likelihood that it will prevail on the merits. Second, the plaintiff must make a sufficient showing that it will suffer irreparable harm if the injunction is not granted. Third, the plaintiff must show that such harm outweighs any harm that granting such relief would inflict on the defendant. Finally, the court must consider the impact of the proposed injunction on the public interest. *See, e.g., Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.,* 753 F.2d 1354, 1356 (6th Cir. 1985). These factors should be balanced in light of the overall goals of preliminary injunctive relief, preserving the *status quo* of the parties and preventing the evisceration of the final resolution of their dispute. *See Ortho Pharmaceutical,* 882 F.2d at 812–14.

Although Tennessee Imports requests injunctive relief to prevent Prix's failure and refusal to honor its contract, it has not suggested what form this relief should take. The Court sees two possible alternatives. First, the Court could enjoin Prix from contracting with other parties in violation of its exclusive contract with Tennessee Imports. Second, the Court could require Prix to honor Tennessee Imports' unfilled orders for parts and machines. The Court finds neither of these alternatives appropriate.

The Court finds that enjoining Prix from developing new contractual relationships would be improper. There appears to be a dispute between the parties as to when their contract terminated. In his declaration, Mr. Filippi indicates that Prix considered the contract terminated in August of 1989. In its complaint, Tennessee Imports maintains that the contract continued in force until August 1, 1990. Even assum-

ing Tennessee Imports prevails in this dispute, the parties contractual relationship is now at an end. Since no exclusive relationship remains for this Court to protect, Tennessee Imports cannot suffer further harm if this Court refuses to enjoin Prix from forming new relationships in the geographical areas once reserved for Tennessee Imports. In contrast, Prix might suffer great harm if it is now so enjoined. Such a restriction upon the free distribution of goods is unjustified under the circumstances.

The Court also finds that forcing Prix to honor any unfilled orders at this stage of the parties litigation would also be improper. Although Tennessee Imports alleges Prix's refusal to honor its contract will cause it irreparable harm, it fails to support this allegation sufficiently. Assuming that Tennessee Imports prevails in arbitration, there is no indication that, if appropriate, specific performance on the contract will not be available to Tennessee Imports at that time. Furthermore, any substantiated loss of business or profits resulting from Prix's alleged breach of contract should be readily compensable by monetary damages. Because the contract is now terminated, the need to perform complex calculations for future damages should be limited. Finally, because such relief would amount to an orde for specific performance of a contract still in dispute, it more closely resembles permanent injunctive relief than temporary injunctive relief. In the absence of a very strong showing of irreparable harm, such relief is inappropriate before a final resolution of the parties' dispute. In short, the Court finds no indication that the arbitration process would be rendered inadequate or meaningless in the absence of preliminary injunctive relief.

### 3. Referring the Parties to Arbitration

■ Since the Court finds all Tennessee Imports' claims against Prix to be arbitrable, the only task remaining for this Court is to refer the parties to arbitration pursuant to the Convention and the Arbitration Act. As indicated above, in actions where all claims are found clearly arbitrable, dismissal is often an appropriate method of referring the parties to arbitration. Because the Court has determined that this is not an appropriate case for preliminary injunctive relief, it finds no reason to stay the plaintiff's action pending arbitration. As to Prix Italia, S.R.L., the Court therefore GRANTS defendants' motion to dismiss for lack of subject matter jurisdiction.

### D. Tennessee Imports' Claims Against Pier Paulo Filippi

■ Tennessee Imports also alleges that Mr. Filippi "induced and procured" Prix's breach of contract in violation of Tenn.Code Ann. § 47–50–109. Because Mr. Filippi, as an individual, is not a party to the contract and, therefore, is not a party to the arbitration agreement, he cannot be bound by it. Therefore, Tennessee Imports' claims against Mr. Filippi do not fall within the scope of Article 8 and cannot be referred to arbitration pursuant to the Arbitration Act.

■ The mere presence in a suit of non-arbitrating parties or non-arbitrable claims, however, will not defeat enforcement under the Act and the Convention regarding those claims which are arbitrable. "The preeminent concern of Congress in passing the Act was to enforce private agreements into which parties had entered, and that concern requires that [courts] rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation...." *Byrd*, 470 U.S. at 221, 105 S.Ct. at 1242–43. "If arbitration defenses could be foreclosed simply by adding as a defendant a person not a party to an arbitration agreement, the utility of such agreements would be seriously compromised. *Hilti, Inc. v. Oldach*, 392 F.2d 368, 369 n. 2 (1st Cir.1968); *accord C. Itoh & Co. (America) Inc. v. Jordan Int'l Co.*, 552 F.2d 1228, 1231 (7th Cir.1977).

■ The Court must, however, decide whether to allow the claims against Mr. Filippi to proceed or to stay these claims pending the completion of arbitration of the claims against Prix. Tennessee Imports' claims against Mr. Filippi are closely related to, and in part dependent upon, its

claims against Prix. In order to sustain an action under Tenn.Code. Ann. § 47–50–109, Tennessee Imports will have to establish, *inter alia,* that Prix breached the parties' contract and what damages resulted from that breach. And in order to prevent double recovery, any damages awarded under this statute will have to be reduced by the amount of monetary damages for breach Tennessee Imports recovers from Prix. *See TSC Industries, Inc. v. Tomlin,* 743 S.W.2d 169, 172 (Tenn.App.1987).

In all likelihood, Prix's liability to Tennessee Imports will rest, in part, upon Mr. Filippi's position as an agent of Prix. These are matters which will be settled in arbitration. Because of the close relation of these actions, the Court finds that a stay of Tennessee Imports' claims against Mr. Filippi pending the completion of arbitration of its claims is appropriate. *See, e.g., Moses H. Cone Memorial Hospital,* 460 U.S. at 20–21, 103 S.Ct. at 939; *Knorr Brake Corp. v. Harbil, Inc.,* 556 F.Supp. 489 (N.D.Ill.1983); *Rhone Mediterranee,* 555 F.Supp. at 486. Such a stay is within the Court's discretionary authority to control its docket. *See Moses H. Cone Memorial Hospital,* 460 U.S. at 20 n. 23, 103 S.Ct. at 939 n. 23.

As to Pier Paulo Filippi, the defendants' motion to dismiss is DENIED. Further proceedings against Mr. Filippi are STAYED and placed on the Retired Docket pending completion of arbitration between Tennessee Imports and Prix.

### II. *Plaintiff's Motion for Leave to Amend*

Tennessee Imports has also petitioned this Court for leave to amend its complaint adding a second count of inducing and procuring breach against a new defendant, Prix, U.S.A. Because no responsive pleading has yet been filed in this suit, the plaintiff is free to amend his complaint once, as a matter of course, without leave of Court. *See* Fed.R.Civ.P. 15(a). The plaintiff's motion is therefore GRANTED.

### III. *Summary*

In summary, as to Prix Italia, S.R.L., the Court GRANTS the defendants' motion to dismiss. The parties are hereby referred to arbitration. As to Pier Paulo Filippi, the Court DENIES the defendants' motion to dismiss, but the Court ORDERS that further proceedings against Pier Paulo Filippi be STAYED and placed on the Retired Docket pending the completion of arbitration between Tennessee Imports and Prix Italia, S.R.L.

The plaintiff's motion for leave to amend is GRANTED.